[Civ. No. 239. Fourth Appellate District.—July 28, 1930.]

D. GROSS, Respondent, v. C. E. HAZELTINE et al., Defendants; B. F. CULLY et al., Appellants.

448

Surr & Hellyer and H. W. Phipps for Appellants.

Harry W. Horton for Respondent.

BARNARD, J.—In this action, plaintiff sought to establish a certain amount as due to him for materials furnished and labor done in improving a certain eighty acres of land belonging to defendants Hazeltine, and sought to establish

and foreclose a lien on the land for the amount claimed. The action is based upon a contract reading as follows:

"Agreement and Lease.

"This agreement and option made and entered into in duplicate at El Centro, Imperial County, California, this 16th day of October 1919 by and between C. E. Hazeltine hereinafter called owner and D. Gross hereinafter called tenant.

"Witnesseth:—Owner is now the owner of Tract 176, Township 16 South, Range 13 East, S. B. M. containing acres and land now in bad condition and requires considerable work to get it in salable condition. Tenant is experienced in leveling land, plaintiff [sic] and harvesting crops and has the necessary live stock and equipment needed to get above described land in proper sale condition and to produce crops thereon.

"In consideration of the above it is hereby mutually agreed that owner is delivering land to tenant under the following terms and conditions:

"Tenant is to enter land immediately and get same in proper condition to produce best crops, plant same to such crops as he deems best suited for land and is to care for and harvest same in best manner possible.

"Said tenant is to pay all water assessments, taxes on land, water, seed and all other expenses required to get land in proper condition and to produce crops thereon.

"It is agreed that should owner sell land within one year from this date that said owner will then pay to tenant all money or moneys which said tenant has expended for water assessments, taxes, water, seed, leveling and for all other expenses incurred by tenant in getting land in condition and to produce crops thereon.

"If said owner has not sold land at end of one year from this date it is agreed that an accounting is then to be made between owner and tenant and after tenant has deducted for all expenses which he has incurred on land and crops during said year a division of profits is to be made between owner and tenant on basis of one-half to each party of said profits.

"Owner hereby gives to tenant an option for one year from this date to purchase said land at price of $200.00 per acre on such terms and under such conditions as may be

agreed upon and owner further agrees that at any time during said first year that he has a chance to sell land that he will first give said tenant the privilege of then buying said land if tenant does not then exercise this option to buy said tenant then loses his option to buy.

"If said owner sells land during the first year it is agreed that he is to then pay to tenant for all money which said tenant has expended in preparing land, making crops, harvesting same, taxes, water assessments, water and all other amounts which tenant has expended on land and crops thereon during the year.

"Tenant is to keep an accurate record of all money he expends on this land and for crops thereon and is to deliver such statement to owner at any time said owner calls for same.

"In witness whereof the parties to this contract have hereto set their hands and seals the day and year first above written.

"C. E. Hazeltine
"Owner

"D. Gross
"Tenant."

Plaintiff took possession of the land and proceeded with the work agreed upon. On July 23, 1920, the land was sold to Fern Hays Cully, one of the appellants, who at some time between that date and October 16, 1920, conveyed the property to appellant P. A. English, who was the owner thereof at the time this action was brought. The plaintiff continued to occupy the premises until some time in November, 1920. On October 28, 1920, plaintiff filed in the office of the county recorder of that county what he denominates "Notice of Contractor's Claim of Lien," in which he sets forth that he had entered into a contract for the improvement of the land here involved, and that said improvements consisted of "labor, materials furnished and money advancements necessary to get said land in a saleable condition, by grading, filling in and levelling the same, planting the same to crops and harvesting said crops." After setting forth the terms of the contract, the notice states that the contract has been fully performed on his part; that the improvements were completed on or about October 16, 1920; that the amount of the contract price and the

reasonable value for the improvements furnished is $6,575.58, and that he has been paid on account $2,878.45. This action was filed on January 25, 1921, the complaint alleging "that the total amount expended by the plaintiff to provide said labor, teams, equipment, power, seed and materials" was the sum of $2,915, of which ninety-one cents had been paid, leaving due $2,914.09, for which amount a lien is claimed. The trial court awarded the plaintiff $1689.60, and decreed that the plaintiff has a lien upon the land in question to secure the same. This appeal was taken upon the judgment roll and a bill of exceptions.

The first question that arises is as to the nature of the contract that is relied upon as the basis for the claim of a lien. We think it clear that this agreement constituted a lease. The parties signed the same as owner and tenant, and they are so referred to throughout the instrument. Not only does the lease provide for possession in the tenant, but the respondent testified: "I was on the ranch a little over a year and moved off in November, 1920. Nobody ordered me off. My possession was never disturbed." He also testified: "I understood that if I lost possession of the place in any way by sale, I was to be reimbursed the money I was out, but if I kept on staying there, I was to have half of the profits and Hazeltine was to have half of the profits." The term of possession was to be one year, unless sooner terminated by a sale, and if the land was not sold in one year, an accounting was to be had and the profits divided. The provision in the lease that respondent was to harvest the crops and an accounting was thereafter to be had, indicates a tenant's interest in the crops. We think this is sufficient to show the agreement constituted a lease. (*Harrelson* v. *Miller & Lux,* 182 Cal. 408 [188 Pac. 800].)

Even if it be assumed that a part of the improvements contemplated by this lease were of such a permanent form as could give rise to a lien upon the land for the benefit of which they were installed, we are of the opinion that the respondent was not entitled to a lien therefor, because of the nature of his agreement. From the very nature of the contract the contemplated improvements were to be made by the tenant, not as a contractor but as a lessee, and not primarily for a certain price, or with the idea that they were to be paid for in the way labor and

materials are ordinarily furnished and paid for. On the other hand, it is apparent that these improvements were contemplated, not merely with the idea of future benefit to the land, but also to its benefit during the term of the lease, and with the intention that such improvements should inure to the benefit of both the owner and the tenant, both sharing in the profits thereof, in accordance with the terms of the lease. As was said in *Dougherty-Moss Lumber Co.* v. *Churchill,* 114 Mo. App. 578 [90 S. W. 405] :

"In a general sense every party to a contract is a contractor, but the term as used in statutes relating to mechanic's liens has a restricted meaning. It refers to one who under contract with the owner, undertakes for a consideration to furnish material, labor, and superintendence required in the improvement of the owner's premises, either in the erection of a structure thereon or in the alteration or repair of one in existence. Obviously there is a difference between a lessee who, for the purpose of enhancing the value of his leasehold, agrees to make improvements at his cost, and a contractor who is to be paid a specific consideration, for which, in case of nonpayment, he is entitled to a lien." (See, also, *McNulty* v. *Offerman,* 221 N. Y. 98 [116 N. E. 775].)

While our attention has not been called to any California cases upon this point, we do not think the tenant here was a contractor within the meaning of our own lien laws.

Again, assuming that defendant Hazeltine may have become liable under his agreement with respondent, any such obligation is neither sufficiently definite nor of proper origin to be the foundation for a lien. A lien of this sort is allowed to secure the payment of an indebtedness owed for labor or materials. The furnishing of the labor and materials must be the exact consideration for the indebtedness, and the indebtedness must not be in consideration of some other benefit or the exercise of some other right. If, when the labor and materials are furnished, there is no indebtedness, there can be no lien. If the subsequent doing of an act gives rise to an indebtedness, the right to a lien cannot then spring up, because that later indebtedness arises, not in consideration of the labor and materials furnished, but in consideration of the subsequent act, even

though their value may be measured by the same amount.

In the instant case, there was no definite indebtedness when the tenant furnished the labor or materials. There was not even a provision that the owner should pay him at the end of the year, even though the crop should not be sufficient to recompense him. In the event the land was not sold, the only agreement was that there should be an accounting at the end of the year; and that the tenant should deduct his expenses, and any profits were to be divided. On the other hand, it was provided that if the owner should sell the land during the year,. he was in that event and at that time, to pay whatever the tenant had expended in preparing the land, making crops, harvesting the same, taxes, water assessments, water and all other amounts expended on the land and crops. It is apparent that most of those items could not be the basis for this sort of lien, in any event. But even such part of the claim for reimbursement as covered permanent improvements, such as might become the foundation of a lien, became an indebtedness only at a later date, and only because of this contingency of a sale, and even then the amount was due, not in payment for labor and materials, but as a consideration for permitting the owner to exercise a right of termination of the lease. Nothing was ever owed to the respondent on this account until the land was sold, and it was then owed, if at all, in consideration of the termination of the contract. It was neither due for labor and materials furnished, nor could the indebtedness date back to the time of furnishing such labor and materials for the purpose of giving a foundation for such a lien. The labor and materials in question were not furnished under an agreement, express or implied, that they were to be paid for; there was no indebtedness for them when they were furnished; and any indebtedness that may have subsequently arisen was for something else.

The provision in this contract and lease regarding the sale of the land within a year and what should then be done, was for the benefit of the owner and could be waived by him. (*Lunke* v. *Egeland*, 46 Mont. 403 [128 Pac. 610]; *Diepenbrock* v. *Luiz*, 159 Cal. 716 [Ann. Cas. 1912C, 1084, L. R. A. 1915C, 234, 115 Pac. 743]; *McVitty* v. *Flentge*, 34 Cal. App. 781 [169 Pac. 666]; *Armas* v.

*Armas,* 58 Cal. App. 717 [209 Pac. 256].) It is undisputed that the respondent here was not dispossessed prior to the end of his term, and that he voluntarily moved off after the year was up. In *Coates* v. *Carse,* 96 Wash. 178 [164 Pac. 760], under a somewhat similar state of facts, the court said:

"Inasmuch as the respondent was not dispossessed of the premises, but was permitted to remain thereon, he was clearly not entitled to recover. The purchaser of the land knew of the tenancy, and therefore could not dispossess the tenant. The appellants could dispossess him only by complying with the terms of the lease, that is, by paying him for his labor and expense, and $200 additional. No effort was made, either by the appellants, or by the purchaser, to dispossess the respondent, and he was therefore not entitled to recover either his expenses, or for his labor, or the $200. He will be remunerated by his share of the crop under the lease."

The respondent here not only remained until the end of the year and secured all the benefits he would have secured had the land never been sold, but, in addition, he claims all the benefits provided for in the contract in case of a sale. Whatever the agreement was, the reason for providing for a payment to respondent in the event of a sale, was to compensate him for any loss of the benefits that would have accrued to him, had the property not been sold. He himself testified:

"I understood that if I lost possession of the place in any way by sale, I was to be reimbursed the money I was out, but if I kept on staying there, I was to have half the profits and Hazeltine was to have half the profits."

Not having lost possession, there does not seem to have been even an agreement to reimburse him, let alone an indebtedness for labor and materials furnished. And yet this is made the foundation of a lien, and made binding on a subsequent purchaser of the land.

A further consideration is that if respondent was entitled to be reimbursed for his expenditures under the clause of the contract providing for this in the event the land be sold, this right arose when the land was sold, which was on July 23, 1920. Leaving out all other consideration, and regarding the sale of the land as marking the comple-

tion of the work, the notice of lien, being filed October 28, 1920, ninety-seven days after the sale, was too late and the lien would be lost. (*Ganahl Lumber Co.* v. *Thompson,* 205 Cal. 354 [270 Pac. 965].) The interpretation of the lease most favorable to respondent is that the sale would terminate the agreement as to the work. If it did not, he is not entitled to any lien. If it did, the notice of lien was filed too late.

The dilemma in which the respondent finds himself is again illustrated by the fact that the notice of lien was filed on October 28, 1920, stating that the work had been completed on October 16, 1920, whereas he testified that he kept on working in leveling the land up to the time he moved away, which he twice stated he thought was in November, 1920. In that view of the case, the work was not completed when the notice of lien was filed, and that notice was premature and conferred no right. (*McCreary* v. *Toronto Midway Oil Co., Ltd.,* 38 Cal. App. 17 [175 Pac. 87]; *Santa Monica L. & M. Co.* v. *Hege,* 119 Cal. 376 [51 Pac. 555].)

The agreement between these parties provides that the tenant was to get the land in proper condition to produce the best crops, to plant such crops as he deemed best and care for and harvest the same. The testimony shows there was work done both in putting the land in condition and in putting in, caring for and harvesting the crops. If it be assumed that any of this work was such as to come within the provisions of section 1183 or 1191 of the Code of Civil Procedure, it is apparent that only the portion thereof which constituted a permanent improvement to the land could be so considered. (*Thomas* v. *Gismegian,* 191 Cal. 497 [216 Pac. 601]; *Ogden* v. *Byington,* 198 Cal. 151 [244 Pac. 332].) There is no evidence in the record from which it may be told which portion of the work went to any such permanent improvement, nor what part of the cost of the work may be attributed thereto. In the recorded notice of lien, the plaintiff swore that the contract price and the reasonable value of said improvements was $6,575.58, and that he had been paid on account $2,878.45. In his complaint, also sworn to, he states that the total amount expended to put said land in condition, and to plant and seed said land to alfalfa and barley, including irrigating, was

456

$2,915. The only evidence shown in the bill of exceptions, which was settled by the court and certified to as containing all of the evidence, shows a list of checks paid out totaling $4,342.94. The evidence shows that of these, $1605.67 was paid for water taxes, interest, etc., for which it is obvious there could be no lien. The plaintiff testified he put sixty-five acres of the land into crop and there was some evidence of some work done in harvesting. It cannot be told how much of the work or expense was put on preparing the land, or how much on putting in the crop, and caring for and harvesting the same. But the plaintiff does say that the portion of the work which he claims to have been a permanent improvement had to be done before the land could be irrigated, and the evidence shows they began to pay for water in December, 1919. He admits he was paid on account $2,878.45, and there is no showing as to how this was applied. It conclusively appears that a large part of the work was not lienable, and it nowhere appears what portion of the amount claimed to have been expended went for permanent improvements.

In this connection, respondent seeks to have considered a supplement or amendments to the bill of exceptions. The bill of exceptions was settled June 7, 1927, and filed June 8, 1927. Thereafter, on July 5, 1927, a notice was served on opposing counsel, which was filed on July 8, 1927, stating that the plaintiff intended to move the court for an order vacating and setting aside the order settling and allowing the bill of exceptions. And further, if that motion should be denied, that they would then move for an order permitting their objections to the bill of exceptions to be heard and considered. This motion was not presented to the court until April 6, 1928, or ten months atfer the bill of exceptions had been settled. The case had been tried by one judge, the bill of exceptions settled by another, and on April 25, 1928, a third judge made an order denying plaintiff's motion to vacate the order settling the bill of exceptions, but purporting to permit an amendment to the bill of exceptions. Application for this order was made too late, and the said amendment cannot be considered on this appeal. (*Hyde* v. *Boyle*, 89 Cal. 590 [26 Pac. 1092]; *Merced Bank* v. *Price*, 152 Cal. 697 [93 Pac. 866]; *In re*

*Morehouse,* 176 Cal. 634 [169 Pac. 365] ; *Brownell* v. *Superior Court,* 157 Cal. 703 [109 Pac. 91].) We may say, however, that if the purported evidence set forth in the so-called amendment to the bill of particulars were to be considered, it could not possibly affect the decision of the case. An analysis of the same shows that it merely adds to the uncertainty shown by the original bill of exceptions on the question of what part of the expenditures were made for permanent improvements, and what part for farming the land, and, of course, it has no effect upon the main question as to whether respondent is entitled to a lien, in any event.

We are not concerned with the judgment against the defendants, other than the appellants.

For the reasons given, the judgment against the appellants is reversed, with directions to the trial court to enter judgment in their favor.

Cary, P. J., and Ames, J., *pro tem.,* concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 15, 1930.